# In the United States Court of Federal Claims

YVETTE MOYLER,

        Petitioner,

        v.

THE UNITED STATES,

        Respondent.

No. 21-1720
Filed under seal: September 3, 2025
Reissued: September 18, 2025

Thomas J. O'Connell, Abramson & O'Connell, LLC, Columbus, OH, for petitioner.

Alexa Roggenkamp, Civil Division, United States Department of Justice, Washington, DC, for respondent.

**OPINION AND ORDER**
**Denying Ms. Moyler's motion for review**

Yvette Moyler filed a petition under the National Childhood Vaccine Injury Act of 1986, seeking compensation for a shoulder injury that she alleges resulted from a tetanus-diphtheria-acellular pertussis ("Tdap") vaccine.[1] She argues that the special master's decision was arbitrary and capricious because the special master (1) did not adequately consider all record evidence when assessing the severity of her injury; (2) made an implausible inference when concluding that her symptoms resulted from a different injury; (3) required her to satisfy a heightened burden of proof and failed to consider witness statements; and (4) abused his discretion by denying an evidentiary hearing.

---

[1] This opinion was originally issued under seal on September 3, 2025. The parties had no proposed redactions. The court reissues the opinion publicly.

1

The special master's findings were not arbitrary, capricious, or an abuse of discretion. He considered the evidence, made plausible inferences, articulated his reasoning, and reached a reasonable conclusion. The court therefore will deny Ms. Moyler's motion for review and affirm the special master's decision.

**I.  Background**

  **A.  Ms. Moyler's medical history**

On September 9, 2019, Ms. Moyler received a Tdap vaccine in her left arm, in the deltoid muscle. ECF No. 25-3 at 4; ECF No. 22-2 at 113. Since before the vaccination, Ms. Moyler had type II diabetes and hypertension. *See* ECF No. 22-2 at 2-72; ECF No. 22-3 at 4-36.

Two weeks after the vaccination, on September 21, Ms. Moyler visited an urgent care center and reported "pain at the injection site from Tdap." ECF No. 22-4 at 3. The doctor prescribed pain medication and instructed her to follow up with her doctor in two days. *Id.* On September 23, Ms. Moyler followed up with her primary-care physician. ECF No. 22-2 at 117. She reported pain at the site of her Tdap injection, which she described as a "toothache" that gradually worsened throughout the day. *Id.* at 118. She stated that she was having trouble completing daily activities and sleeping on her left side due to the pain. *Id.* A physical examination showed tenderness over the left deltoid but a normal range of motion. *Id.* at 120. The physician noted that Ms. Moyler was "likely [experiencing a] localized reaction following administration of her Tdap vaccination" and advised her to use cold compresses and Tylenol to manage the pain. *Id.* at 118, 122.

Two days later, Ms. Moyler underwent an upper left arm ultrasound, which found no fluid collection or abscess. ECF No. 22-2 at 131. Ms. Moyler called her primary-care physician's office five days later and reported that she was still experiencing arm pain and could "barely lift [her] arm." *Id.* at 127. A nurse advised her to continue using a cold compress, taking Tylenol, and moving her arm. *Id.*

Ms. Moyler did not return to her primary-care physician for care for her left upper arm until about nine months later in June 2020. *Id.* at 133. During that nine-month period, she had four appointments, in December 2019 and March, April, and May 2020, with an internal-medicine physician. In those appointments, she addressed her diabetes and hypertension but not her arm pain. ECF No. 22-18 at 61-108. Ms. Moyler alleges that she continued experiencing pain in her upper left arm throughout that nine-month period, although the most severe pain subsided after one month. ECF No. 42-3 at 3-4. She continued to take Tylenol and took Ibuprofen during that time. According to Ms. Moyler, she was under the impression that there was no other treatment that could be provided for her ongoing symptoms. *Id.*

In May 2020, Ms. Moyler began a new job at an assisted living facility where she "assist[ed] residents with transfers, cleaning, laundry, lifting food trays, and trash removal." ECF No. 42-3 at 5. She alleges that the pain in her left arm got worse with the increased activity required by her job, and she also started experiencing muscular pain near her neck. *Id.* at 5.

On June 14, 2020, Ms. Moyler visited the emergency room to seek treatment for swelling in her left shoulder, upper arm, and neck. ECF No. 22-5 at 5. The emergency room physician found swelling in her upper arm and trapezius muscle, placed her arm in a sling, and recommended that she take anti-inflammatories and muscle relaxers. *Id.* at 7-8. The next day, Ms. Moyler called her primary-care physician's office to report that she had visited the emergency room the night before and that her left arm and neck were swollen and in pain. She stated that the swelling began after her Tdap vaccination, and that she was also waking up with a tingling sensation in her fingers. ECF No. 22-2 at 133. Later that day, she visited her primary-care physician's office and reported the same symptoms. *Id.* at 145. The physician noted an unclear etiology that was "possibly [osteoarthritis], unlikely infection or [deep vein thrombosis] or trauma / injury" and ordered an MRI of

3

her left shoulder and an x-ray of her cervical spine. *Id.* A week later, Ms. Moyler visited her primary-care physician's office again and met with a different doctor. *Id.* at 155. She again reported chronic left arm and shoulder pain and swelling since her Tdap vaccination, which she stated had gotten worse after starting her new job. *Id.* That physician also noted an "unclear" etiology, that the pain "seems neuropathic," and that all her workup thus far, including an ultrasound and x-ray, had been "negative." *Id.*

In the meantime, Ms. Moyler alleges that it was getting more difficult to do her job at the assisted living facility, and the pain ultimately prevented her from working. ECF No. 42-3 at 5. Ms. Moyler alleges that, as a result, she left her job in July 2020. *Id.*

Ms. Moyler underwent an MRI on August 8, 2020. ECF No. 22-2 at 162. Two days later, her primary-care physician called her to discuss the MRI results, which showed "diffuse muscle edema" throughout her infraspinatus and supraspinatus muscles from an unknown etiology, tendinopathy, and a possible grade 1 muscle strain. *Id.* at 161, 165. The physician recommended an EMG study and referred her to Dr. Bryce Fincham, an orthopedist. *Id.* at 161, 166-167. The next month, Mr. Moyler had an appointment with Dr. Fincham; she reported burning pain, numbness, tingling, and weakness in her left shoulder. *Id.* at 167-68. Like her primary-care physician, Dr. Fincham also recommended an EMG nerve conduction study of her upper left arm. *Id.* at 171. Ms. Moyler underwent the EMG study on September 23, which showed carpal tunnel syndrome but no other issues. *Id.* at 179-80. The EMG did not test the infraspinatus and supraspinatus muscles, which were the muscles that the MRI had found to be abnormal. ECF No. 42-6 at 4 (expert report by Dr. Scott Lipson).

4

Ms. Moyler continued taking medication for her pain in the meantime and participated in physical therapy in December 2020 and January 2021, but neither relieved the pain. ECF No. 42-3 at 6-7.

In May 2021, Ms. Moyler underwent another EMG study, this time testing the left infraspinatus and supraspinatus muscles. ECF No. 22-6. The EMG found a "severe, isolated involvement of the left suprascapular nerve." *Id.* at 2. On August 2, 2021, Ms. Moyler had an appointment with neurological specialist Dr. Scott Lipson. ECF No. 22-7 at 2. Dr. Lipson examined the back of Ms. Moyler's left shoulder, which revealed atrophy of the left supraspinatus and infraspinatus muscles and loss of strength in those muscles. *Id.* at 6-7. Dr. Lipson photographed Ms. Moyler's back during his examination. *Id.* at 6. After reviewing Ms. Moyler's medical records, Dr. Lipson concluded that Ms. Moyler suffered from severe post-vaccine brachial neuritis. *Id.* at 10-12. Dr. Joseph Feinberg, a physiatrist who treats brachial plexus and traumatic nerve injuries, reached the same conclusion after reviewing Ms. Moyler's medical records. ECF No. 42-10.

### B. The procedural background of this case

On August 18, 2021, Ms. Moyler filed a petition with the Office of Special Masters in this court alleging that she has brachial neuritis or suprascapular neuropathy directly caused by the Tdap vaccine she received in September 2019 and that her symptoms have persisted for more than six months. ECF No. 1 at 3-4 [¶¶17-19]. On May 25, 2022, the special master held a status conference, where he discussed the statutory requirement that a petitioner show six months of post-vaccination symptoms and encouraged Ms. Moyler to file additional medical records or supplemental affidavits to show that she satisfied the requirement. ECF No. 20 at 2 (citing 42 U.S.C. § 300aa-11(c)(1)(D)(i)). Ms. Moyler filed additional exhibits, including affidavits from herself and her daughter, as well as affidavits from two friends. EFC Nos. 25-4, 25-5, 25-6, 42-3, 42-4, 42-5. Ms. Moyler also filed Dr. Lipson's photo of her back, which she alleges demonstrated the severity

5

of her condition. ECF No. 22-7 at 6. The parties spent time trying to reach an informal resolution but were unsuccessful. ECF No. 37. The government then filed a report under rule 4(c) of the Rules of the Court of Federal Claims, arguing that Ms. Moyler had not provided sufficient evidence to meet the Vaccine Act's severity requirement. ECF No. 39 at 8-10.

The special master concluded that Ms. Moyler did not satisfy the six-month severity requirement and dismissed Ms. Moyler's case. ECF No. 49.[2] The special master explained that Ms. Moyler's medical records suggest that the injury was initially severe but improved over time. *Id.* at 11. He noted that Ms. Moyler discontinued treatment for her shoulder within a month after her vaccination and did not have a follow-up evaluation or any mention of her shoulder in her medical records until about nine months later, creating a gap in medical records between September 30, 2019, and June 14, 2020. *Id.* The special master also noted Ms. Moyler's new job at an assisted living facility as a competing factor that, she stated, exacerbated her symptoms, and that her symptoms were mild enough at that time to take the job. *Id.* at 11-12.

When reviewing her medical records, the special master also found that Ms. Moyler's symptoms differed before and after the gap in treatment. According to the special master, her symptoms in September 2019 were tenderness but no edema; her symptoms in June 2020 were neck pain, swelling in the left upper arm and hand, numbness and tingling in her left hand and fingers, and weakness in her left arm. ECF No. 49 at 13. The special master also pointed out that before the treatment gap, in September 2019, Ms. Moyler's primary-care physician attributed the symptoms to "a likely localized reaction following administration of the Tdap vaccination in her left upper extremity." Nine months later, other physicians thought her pain might be from a blood

---

[2] The special master initially released his opinion under seal at ECF No. 45. He later released a public version of his opinion, ECF No. 49.

6

clot from overuse, an inflammatory process, or a neuropathic etiology. *Id.* at 13. The special master also determined that the expert reports and affidavits Ms. Moyler submitted could not overcome the existing medical records and gap in care. *Id.* at 13-14.

Ms. Moyler seeks review of the special master's decision dismissing her case. ECF No. 47. She argues that the special master's decision was arbitrary and capricious, that he failed to consider all the evidence presented, and that his conclusion that her symptoms were caused by a separate workplace injury is not plausible. *Id.* at 1-2. She also argues that the special master abused his discretion by denying an evidentiary hearing. *Id.* at 24-25.

**II.    Discussion**

This court has jurisdiction to review a special master's decision under the Vaccine Act. 42 U.S.C. § 300aa-12(e). On a motion for review, this court may uphold or set aside the special master's findings of fact and conclusions of law or remand the petition to the special master for further action. 42 U.S.C. § 300aa-12(e)(2); *accord* Vaccine Rule 27.

This court reviews the decision of a special master to determine whether it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 42 U.S.C. § 300aa-12(e)(2)(B); *Masias v. Secretary of Health and Human Services*, 634 F.3d 1283, 1287 (Fed. Cir. 2011); *accord* Vaccine Rule 27. That standard is "well understood to be the most deferential possible." *Munn v. Secretary of Health and Human Services*, 970 F.2d 863, 870 (Fed. Cir. 1992).

"If the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines v. Secretary of Health and Human Services*, 940 F.2d 1518, 1528 (Fed. Cir. 1991); *see White v. Secretary of Health and Human Services*, No. 24-1372, ECF No. 37 at 5 (Fed. Cir. Aug. 27, 2025). This court, like the Federal Circuit, does "not reweigh the factual evidence, assess whether the special master correctly evaluated the evidence, or examine the probative

7

value of the evidence or the credibility of the witnesses—these are all matters within the purview of the fact finder." *Porter v. Secretary of Health and Human Services*, 663 F.3d 1242, 1249 (Fed. Cir. 2011); *see Munn*, 970 F.2d at 871-72 (explaining that the Federal Circuit and this court apply the same standard).

This court reviews discretionary rulings, including case management decisions, for abuse of discretion. *Munn*, 970 F.2d at 870 n.10. That review "will rarely come into play except where the special master excludes evidence." *Id.* The court gives "no deference to the … Special Master's determinations of law," reviewing legal questions de novo. *Carson v. Secretary of Health and Human Services*, 727 F.3d 1365, 1368 (Fed. Cir. 2013).

Under the Vaccine Act, a petitioner seeking compensation for injuries caused by a covered vaccine can prove entitlement to compensation in one of two ways. For so-called table injuries, a petitioner may recover when an injury or condition listed in the vaccine injury table (42 U.S.C. § 300aa-14(a)) begins to manifest itself within the time specified in the table for the vaccine in question. *Hines*, 940 F.2d at 1524; *see* 42 U.S.C. § 300aa-11(c)(1)(C)(i). Causation in those cases is presumed. *Hines*, 940 F.2d at 1524. For off-table injuries, which are not listed in the table or occur outside the timeframe specified in the table, the petitioner must prove actual causation. *Id.* at 1524-25; 42 U.S.C. § 300aa-11(c)(1)(C)(ii). For both table and off-table injuries, the petitioner must prove, by a preponderance of the evidence, entitlement to compensation. *Id.* at 1525; 42 U.S.C. § 300aa–13(a)(1)(A).

In table injury cases, as long as the claim is "within the timetable and specifications of a Table injury [then] the statute does the heavy lifting—causation is conclusively presumed." *Hodges v. Secretary of Department of Health and Human Services*, 9 F.3d 958, 961 (Fed. Cir.

8

1993); *see White*, No. 24-1372, ECF No. 37 at 5. According to the vaccine injury table, the symptoms for brachial neuritis must appear within two to 28 days after administration of the Tdap vaccine. 42 C.F.R. § 100.3. Here, Ms. Moyler also bears the burden to prove, by a preponderance of the evidence, that she suffered from brachial neuritis for more than six months after receiving her Tdap vaccine. 42 U.S.C. § 300aa-13(a)(1)(A); 42 U.S.C. § 300aa-11(c)(1)(D)(i). That includes providing "documentation demonstrating that [she] … suffered the residual effects or complications … for more than 6 months after the administration of the vaccine." 42 U.S.C. § 300aa-11(c)(1)(D)(i). A case may be dismissed for failure to meet the six-month severity requirement. *See, e.g.*, *Felix v. Secretary of Health and Human Services*, 172 Fed. Cl. 626, 633-34 (2024).

### A.   The special master's decision was not arbitrary or capricious

In Vaccine Act cases, this court must uphold a special master's factual finding "as not being arbitrary or capricious" if the finding is "based on evidence in the record that is not wholly implausible." *Cedillo v. Secretary of Health and Human Services*, 617 F.3d 1328, 1338 (Fed. Cir. 2010) (cleaned up). That standard is similar to, and even more deferential than, the substantial evidence standard a court of appeals applies to its review of the factfinding of an administrative agency. "Substantial evidence is … such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). A "finding may be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence." *Citigroup Inc. v. Capital City Bank Group, Inc.*, 637 F.3d 1344, 1349 (Fed. Cir. 2011). Both the substantial evidence and the arbitrary and capricious standards of review require the court to uphold a factual determination unless the evidence cannot reasonably be interpreted in a way that supports the determination. *See Shoes by Firebug LLC v. Stride Rite Children's Group, LLC*, 962 F.3d 1362, 1371 (Fed. Cir. 2020) (explaining that, when the lower tribunal was

presented with two alternative theories, the reviewing court's "task is not to determine which theory [it] find[s] more compelling" or "to second-guess the [tribunal's] assessment of the evidence" (quotation marks omitted)).

### 1. The special master's decision was not arbitrary or capricious in finding that Ms. Moyler's symptoms came from a different injury

Ms. Moyler argues that the special master's inference that her symptoms came from a workplace injury was implausible. ECF No. 47 at 16. She asserts that the record does not indicate that she suffered a different injury to her arm and shoulder while working and points out that there are no incident reports from her employer, no worker's compensation claims on file, and no medical records indicating a new injury. *Id.* Ms. Moyler also argues that no medical evidence can connect her work activities to her muscle atrophy and nerve damage. *Id.* She adds that the expert reports she submitted found that her symptoms were caused by brachial neuritis from her Tdap vaccination, not from a different injury, and that brachial neuritis is often missed, delayed, or misdiagnosed. *Id.* at 17 (citing ECF No. 22-7 at 11-2; ECF No. 42-6 at 3-4; ECF No. 42-10 at 2).

The government responds that the special master's conclusion that Ms. Moyler's initial symptoms were unrelated to her later symptoms is reasonable. ECF No. 50 at 10. According to the government, the special master reasonably evaluated the evidence and medical records, which imply that Ms. Moyler's pain was initially severe but improved over time and that there was a significant gap in treatment. *Id.* at 14-15. The government also notes that the special master found that Ms. Moyler's new job may have exacerbated her shoulder pain and that her symptoms after the gap in treatment were different from her symptoms before. *Id.* The government argues that the special master "properly afforded little weight to" Ms. Moyler's expert reports, which did not address the gap in treatment or fully diagnose Ms. Moyler's symptoms. *Id.* at 16-17.

When a special master considers the relevant evidence of record, draws plausible inferences, and articulates a rational basis for his decision, the court must uphold his decision. *Hines*, 940 F.2d at 1528. The special master's decision does not have to be the only possible conclusion. It must only be a conclusion that a reasonable mind could reach based on the totality of the evidence; that is, it must not be wholly implausible. *Cedillo*, 617 F.3d at 1338; *Citigroup*, 637 F.3d at 1349. This court must uphold the special master's factual determinations even if it would have reached a different factual conclusion had it been the one conducting the evidentiary review. *Citigroup*, 637 F.3d at 1349; *Shoes by Firebug*, 962 F.3d at 1371.

Here, the special master reviewed Ms. Moyler's medical record. He noted that Ms. Moyler stopped receiving treatment for her upper left arm "the same month" she received the vaccine. He also noted that Ms. Moyler did not seek treatment for her symptoms for nine months, and only after she started a new, more demanding job. ECF No. 49 at 11. The special master explained that during those nine months, Ms. Moyler had four doctors' appointments for other medical issues but did not mention anything related to her upper left arm or shoulder. *Id.* at 12. After reviewing the records from Ms. Moyler's appointments, the special master distinguished Ms. Moyler's symptoms in June 2020 from those that began in September 2019. *Id.* at 12-13. The special master noted that Ms. Moyler's June 2020 symptoms were different from those she alleged in September 2019; in September 2019 her symptoms indicated a myofascial trigger point on her left deltoid but no edema, while in June 2020 her symptoms included swelling, burning pain that spread to her trapezius and neck, left hand swelling, fingertip numbness, and tingling. *Id.*; ECF No. 22-2 at 131-132, 138, 145, 155, 168; ECF No. 22-18 at 7.

11

The special master considered the fact that Ms. Moyler's later symptoms appeared a month after she started new and more physically demanding work activities, and that they were distinguishable by type and location from her September 2019 symptoms. ECF No. 49 at 12-13. The special master appropriately considered the evidence, including Ms. Moyler's medical records, providers' different theories regarding her symptoms, and work activities. He clearly articulated his conclusion that her new job caused a different injury and that her initial symptoms did not last six months. *Id.* at 12-13; *see Hines*, 940 F.2d at 1528; *Cedillo*, 617 F.3d at 1338; *Citigroup*, 637 F.3d at 1349.

There are legitimate reasons to be skeptical of the special master's conclusion. First, he stated that Ms. Moyler visited the same primary care provider who initially treated her post-vaccine symptoms four times during that nine-month period. ECF No. 49 at 12. The special master appears to have been mistaken, as she visited different providers during that period. ECF No. 22-18. When visiting a different provider for a different reason, it is not apparent that a patient would necessarily raise a concern about an unrelated injury for which she had already seen a different provider. Second, the special master also expressed concern that Ms. Moyler was willing to take on a new job, with more physical demands, undercutting her argument that she was already injured from the vaccine. ECF No. 49 at 12. But there are many reasons a person might take a new job, not least the need for pay and healthcare, even if it might exacerbate an existing injury. That said, the conclusion that the new job caused a new injury is plausible. Although there is another plausible—potentially even more plausible—explanation that Ms. Moyler's symptoms began in September 2019 and continued through June 2020 and after, potentially with symptoms morphing over time, the court cannot second guess the special master's weighing of the evidence to reach the conclusion he did.

Ms. Moyler also suggests that the six-month severity requirement could still be met if it started when she got the August 2020 MRI. ECF No. 47 at 15. She argues that the "relevant inquiry is whether any residual effect or complication lasts for more than six months, regardless of the time of onset." *Id.* But to prove entitlement for a table injury, a petitioner must have developed the post-vaccination symptoms within the time specified in the table for the vaccine in question. *Hines*, 940 F.2d at 1524; *see* 42 U.S.C. § 300aa-11(c)(1)(C)(i). For the Tdap vaccine, the symptoms for brachial neuritis must appear within two to 28 days after vaccination. 42 C.F.R. § 100.3. Thus, the six months began when Ms. Moyler reported symptoms in that 28-day window.

The special master's decision not to afford weight to Ms. Moyler's expert reports was likewise not arbitrary or capricious. The special master noted that Ms. Moyler's expert reports did not "address what occurred during the relevant gap in care [and] … what if any of [Ms. Moyler's] vaccine-related symptoms were ongoing between September 2019 and June 2020." ECF No. 49 at 14; *see* ECF Nos. 22-7, 42-10. Without information on the severity of Ms. Moyler's injury, it was reasonable for the special master to determine, without finding the expert reports not credible, that the expert reports did not provide adequate evidence to support a conclusion that Ms. Moyler was suffering from the same injury she received in September 2019.

It was also reasonable for the special master to find that Ms. Moyler's friends' and daughter's affidavits did not rebut her nine-month treatment gap. *See Cucuras v. Secretary of Department of Health & Human Services*, 993 F.2d 1525, 1528 (Fed. Cir. 1993) (affirming the special master's decision to prioritize and rely on medical records over testimony). Ms. Moyler argues that the special master imposed a standard of proof closer to beyond a reasonable doubt than preponderance of the evidence. ECF No. 47 at 23-24. But the special master explained that the affidavits and expert reports were just not enough to overcome, by a preponderance of the evidence,

13

the existing medical records and to rebut the treatment gap. *See* ECF No. 49 at 10, 13-14; *Cucuras*, 993 F.2d at 1528. That conclusion based on a weighing of the record evidence is not one the court can second guess.

### 2. The special master appropriately addressed, considered and weighed the evidence presented

Ms. Moyler argues that the special master failed to consider the totality of the evidence in his severity analysis and that that failure constitutes error. ECF No. 47 at 10-15 (citing *Moriarty v. Secretary of Health and Human Services*, 844 F.3d 1322, 1328 (Fed. Cir. 2016)). Specifically, she argues that the special master did not consider her MRI and EMG test results and the photos of her back because he did not discuss them in his severity analysis. ECF No. 47 at 12. She also argues that the special master discounted her expert reports, did not address their credibility, and dismissed them for not addressing the nine-month gap in treatment. *Id.* at 13.

The government responds that the special master is presumed to have considered all evidence in the record, even if he does not explicitly reference it in his decision. ECF No. 50 at 12 (citing *Moriarty v. Secretary of Health and Human Services*, 844 F.3d 1322, 1328 (Fed. Cir. 2016)). The government points out that the special master did discuss Ms. Moyler's test results in the background section of his decision, but that the disputed tests took place after Ms. Moyler started her new job, and the special master found those results to be unrelated to the symptoms she was experiencing immediately after the vaccine. ECF No. 50 at 12 (citing ECF No. 49 at 5, 7, 9). The government argues that the real issue is whether Ms. Moyler's symptoms were part of her initial incident after the vaccine or from a new injury. *Id.*

Generally, "even if the special master had made no explicit reference to the evidence," the court presumes that he considered the totality of the evidence. *Hazlehurst v. Secretary of Health and Human Services*, 604 F.3d 1343, 1352 (Fed. Cir. 2010); *see Medtronic, Inc. v. Daig Corp.*,

14

789 F.2d 903, 906 (Fed. Cir. 1986) ("We presume that a fact finder reviews all the evidence presented unless he explicitly expresses otherwise."). Here, the special master discussed most evidence presented, including Ms. Moyler's medical records, test results, affidavits, and expert reports. ECF No. 49 at 3-9. While the special master limited his discussion of some of the evidence to the background section of his decision, and did not address other pieces of evidence—the pictures of Ms. Moyler's back—that was within his authority. *See, e.g.*, *Gonzalez v. Secretary of Health & Human Services*, 173 Fed. Cl. 728, 735 (2024) (upholding the special master's factual findings even though his decision did not expressly discuss the petitioner's affidavit); *Simanski v. Secretary of Health & Human Services*, 115 Fed. Cl. 407, 436 (2009), *aff'd*, 601 F. App'x 982 (Fed. Cir. 2015) ("[A] Special Master is not required to discuss every piece of evidence or testimony in [his] decision." (cleaned up)). After considering the totality of the evidence, the special master appropriately determined that Ms. Moyler's post-vaccine symptoms did not persist for at least six months and instead that her current symptoms resulted from new work activities. ECF No. 49 at 11-14.

> **B.    The special master did not abuse his discretion by deciding not to conduct an evidentiary hearing**

Ms. Moyler argues that the special master's decision not to hold an evidentiary hearing was arbitrary, capricious, and an abuse of discretion. ECF No. 47 at 24. She argues that Vaccine Rules 3(b) and 8(c) counsel in favor of holding an evidentiary hearing when testimony reasonably might address apparent tension between medical records and later recorded recollections. *Id.* (citing *Campbell v. Secretary of Health & Human Services,* 69 Fed. Cl. 775, 778 (2006)). According to Ms. Moyler, her silence regarding her left arm and shoulder symptoms during her medical appointments in the nine months before June 2020 does not provide a basis for presuming that her medical

15

records addressed every symptom she was experiencing. *Id.* She also argues that there was a compelling need for the special master to conduct an evidentiary hearing to evaluate the credibility of the witnesses who corroborated her ongoing symptoms during those nine months. *Id.* at 24-25. The government responds that hearings are not required by the Vaccine Act and that special masters can rule on the record when each party has already had a full and fair opportunity to present its case. ECF No. 50 at 17.

"Special masters have wide discretion in determining whether to conduct an evidentiary hearing." *Kreizenbeck v. Secretary of Health and Human Services*, 945 F.3d 1362, 1365 (Fed. Cir. 2020); *see* 42 U.S.C. § 300aa-12(d)(3)(B)(v) (the special master "may conduct such hearings as may be reasonable and necessary"); Vaccine Rule 8(d) ("The special master may decide a case on the basis of written submissions without conducting an evidentiary hearing."). In *Campbell*, which Ms. Moyler relies on for her argument, the special master rejected the petitioners' witness affidavits and expert reports and sua sponte added articles to the record without giving the petitioners any opportunity to respond to them. *Campbell*, 69 Fed. Cl. at 779. Here, Ms. Moyler submitted witness affidavits and expert reports, all of which the special master reviewed. *See* ECF No. 49 at 13-14. In considering the affidavits and expert reports, the special master concluded that, although they merited "some weight," they did not rebut the treatment gap in the medical records. *Id.* As discussed, that conclusion was not arbitrary or capricious. *Cucuras*, 993 F.2d at 1528; *Cedillo*, 617 F.3d at 1338. Although an evidentiary hearing would have been a reasonable choice, especially when choosing to discount some evidence based on its timing or inferred motives, the special master was within his discretion not to conduct an evidentiary hearing.

### III.     Conclusion

This court **denies** Ms. Moyler's motion for review and **affirms** the special master's decision. The clerk of the court shall enter judgment accordingly.

**IT IS SO ORDERED.**

                                           /s/ Molly R. Silfen
                                           MOLLY R. SILFEN
                                           Judge